UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-69 GMH |
| v. : | |
| : | |
| CHRISTINA LEGROS, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christina Legros to three months' incarceration, followed by one year of supervised release. The government also requests that this Court impose, consistent with the plea agreement in this case, $500 in restitution.

**I.      Introduction**

Defendant Christina Legros, a 23-year-old woman from Flint, Michigan, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Legros pled guilty to a violation of Entering and Remaining in a Restricted Area, in violation of 18 U.S.C. § 1752(a)(1). The government's recommendation is supported by Legros': (1) participation in the initial breach of the outer restricted perimeter; (2) close proximity to police efforts to prevent the breach of the inner perimeter at the foot of the Northwest Stairs; (3) decision to ignore police commands to leave the restricted area and continue moving forward despite having been sprayed by police munitions; (4) entry into a highly sensitive space, the Speaker's Suite, where she observed and filmed other rioters ransack that area; and (5) her protracted stay within the Capitol building, where she remained for roughly 1 hour and 15 minutes.

The Court must consider that Legros' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for her actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Legros's crime support a sentence of three months of incarceration in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 121 p. 1-3 (Statement of Offense).

*Defendant Legros's Role in the January 6, 2021 Attack on the Capitol*

Legros borrowed a vehicle belonging to her grandmother and travelled to Washington D.C. in late December 2020 with her co-defendant, Isaac Thomas. On the first night of their travel, the two attempted to stay the evening at a hotel in Maumee, Ohio, but were unable to book a room

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

given their age. Staff at the hotel asked the couple to leave, but they refused. Police were called to escort them off hotel grounds and the two recorded the extended interaction with police on their cell phones. *See Figure 1*.

 

*Figures 1-2: Legros' co-defendant, Isaac Thomas, confronted police at a hotel in Ohio.*

During this interaction, Thomas asserted a constitutional protection against a hotel refusing service and refused to leave the premises. When one officer was unable to convince the couple to leave, a second arrived. This extended interaction did not deter Legros's travel to Washington D.C. with her co-defendant.

Although the couple arrived at Washington D.C. the following day and explored the city and visited different sites. When the two visited the U.S. Capitol grounds on December 30, 2020, the west front was already surrounded by signs that read, "AREA CLOSED." They soon after travelled to New York City for the New Year.

Legros headed back to the Washington D.C. area on January 4, 2021. On the evening of January 5, 2021, the couple attended an election related rally inside the District. On the morning of January 6, 2021, the couple again travelled into the city to attend the rally at the Ellipse. The car was parked somewhere within the District that morning.

At approximately 12:23 p.m., Legros began walking towards the Capitol along Constitution Avenue. While walking along the road, Legros joined others in chants and at one point her co-defendant described to her, "where we're going to right now, they're going to be voting. Pretty soon they're going to be having a big hearing. To decide who's going to be . . . ." ECF No. 121 p. 5. Legros arrived at the West Front near the Peace Monument, which was then lined with bike racks, and observed fencing, uniformed officers, and signs on fencing blocking entry onto the restricted area of the grounds. At approximately 12:53 p.m., Legros joined other rioters in climbing over that fencing and entered onto the restricted area. Legros moved north off the Pennsylvania Ave. walkway on to the grass as rioters pushed the bike rack fencing at the officers. She was one of the first rioters on January 6, 2021 to climb over barriers and enter into the restricted perimeter.

Legros's pace quickened as she moved toward the Capitol building, and she moved around another line of fencing, and then jumped over a half-wall onto the West Plaza at approximately 12:57 p.m. Legros and her co-defendant remained near the foot of the Northwest Stairs for nearly an hour. During this time, officers used non-lethal crowd dispersal tools in their attempts to get rioters off the grounds. Legros herself was sprayed in the face with chemical irritants, at approximately 1:41 p.m., but still did not leave. Instead, she recorded with her phone as her co-defendant and other rioters forcibly assaulted officers and pushed through a line at the bottom of those steps. This breach on to the Upper West Terrace occurred before any others on to the Upper

West Terrace. Legros was pushed up with the crowd initially, but soon made her way back down the stairs.

Instead of leaving at this point, Legros joined in chants of "U.S.A.!" and joined her co-defendant in travelling back up the Northwest Stairs to the Upper West Terrace. Only four minutes after the initial breach into the building, Legros entered at approximately 2:17 p.m. *See Figure 3*.



*Figure 3: Legros entered the U.S. Capitol at 2:17 p.m., shortly after the first breach of the building.*

Legros and her co-defendant entered the Capitol eight minutes before the Vice-President was evacuated. They moved to the Crypt and past another line of officers. Legros went upstairs and into the Speaker's suite of offices. At approximately 2:32 p.m., Legros recorded fellow rioters breaking glass within the suite, and captured the overturned furniture with her camera. Two minutes later, Legros approached a television turned to a national news channel providing coverage of the Capitol being overrun.

Inside the Speaker's suite Legros recorded rioters kicking doors, smashing glass, and overturning furniture. Some of the workstations within had hastily left beverages and computer

screens still turned on. Legros moved through the suite towards the West Staircase where she recorded more rioters entering the building. Legros yelled, "Woo!"

Legros moved to the Rotunda and observed other rioters waving individuals towards the north side and yelling, "Come to the Chamber!" At a line of officers in the lobby outside the Old Senate Chamber, Legros joined in chants of, "You serve us!" Legros stated, "yeah we have to push through," and then recorded her co-defendant put on goggles. *See Figure 4.*



*Figure 4: Still from video recording captured from Legros's cell phone. Thomas put on goggles to protect against the effects of chemical irritants as rioters clashed with police by the Old Senate Chamber*

As rioters began pushing against the police line, Legros stated, "Aw shit!" Her phone's battery died soon after.

The police line did not break. Instead, officers used chemical irritants to prevent rioters from getting into the Senate side of the building. This push occurred approximately 30 minutes

after the Vice President was evacuated from the Senate Chamber. During the push, Legros was separated from her co-defendant, and she walked to the East Rotunda Door lobby. There she moved back and forth between the Rotunda and East Rotunda Door lobby until approximately 3:33 p.m. Legros then, after approximately one hour and fifteen minutes inside the Capitol, left the building.

For the rest of that afternoon and into the early evening, Legros attempted to find the vehicle she borrowed. When unsuccessful, she returned to her shared hotel room using Lyft. On January 7, 2021, the two called the police to see where the car was. The couple were told that the events required a lot of vehicles to be moved very quickly. There was not a record of where the car was moved to. Legros travelled back into the city to attempt to locate the borrowed car.

On January 8, 2021, still unable to locate the borrowed vehicle, Legros sent an audio message and stated, "I'm just really worried you know, because this whole like you know me and Isaac broke into the Capitol now we're seeing like a lot of news reporters and stuff and you know my car just went missing and they're trying to find everybody that was in there and all that." Soon after, Legros continued, "I think something bad is going on, and I already told you that and I know I am really high, but I feel it more intense now, umm, . . . Because they're after us I'm really scared. I'm so scared." On January 10, 2021, the couple returned to Michigan via Greyhound bus.

On January 19, 2021, agents from the FBI interviewed both Thomas and Legros at Thomas's residence. During the interview, Legros consented to a search of her cell phone. Technology issues did not allow an onsite download of the contents, but Legros also consented to a temporary seizure to allow for the download. Legros explained to agents that she drove her grandmother's car to Washington D.C. Subsequent investigation by the FBI discovered that the vehicle was retrieved by Legros in February 2021.

*The Charges and Plea Agreement*

On March 8, 2023, the United States formally charged Legros alongside her co-defendant by a twelve-count indictment of four misdemeanor offenses. On May 1, 2024, pursuant to a plea agreement, Legros pleaded guilty to Count Six of the Indictment charging her with a violation of 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Area). By plea agreement, Legros agreed to pay $500 in restitution to the Architect of the Capitol. Further, the government agreed to cap its allocution to the mid-point of the correctly scored guidelines at sentencing.

**III.     Statutory Penalties**

Legros now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement, the defendant faces up to one year of imprisonment. The defendant must also pay restitution under the terms of her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

**IV.     The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The correctly scored guidelines should be:

| | |
|---|---:|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | <u>-2</u> |
| Total Adjusted Offense Level | 4 |

Section 4C1.1 does not apply in this case. The defendant should receive one criminal history point for her prior deferred sentence. *See* § 4C1.1(a)(1).

But also, due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of three months incarceration followed by one year of supervised release.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Legros's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Legros, the absence of violent or destructive acts is not a mitigating factor. Had Legros engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Legros's case is just how obvious it was that she should not have been present at the Capitol on January 6, 2021. Legros observed and recorded several violent confrontations with police, was pepper sprayed, and purposefully jumped over fencing and barriers outside of the Capitol building. Ignoring all the warning signs that she was not permitted to be there, Legros consistently remained at the front lines of the mob and penetrated some of the most sensitive areas of the U.S. Capitol Building while remaining in the building for an hour and 15 minutes. And while she was inside, Legros joined and filmed rioters who were ransacking the Speaker's suite and very nearly pushed past officers to get into the Senate Chamber.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Legros's History and Characteristics

Although at the time of writing probation has not yet provided a PSR, the government has located three other criminal incidents.

10

On March 24, 2020, Legros was arrested in Livingston County Michigan for an assault. On October 26, 2020, Legros's sentence was deferred under Michigan's Domestic Violence Act. Under Michigan Compiled Law 769.4a, "(1) When an individual . . . *pleads guilty to, or is found guilty of*, a violation. . . the court, without entering a judgment of guilt . . . may defer further proceedings and place the accused on probation as provided in this section." (emphasis added). §4A1.2(f) reads, "A diversionary disposition resulting from a finding or admission of guilt . . . is counted as a sentence under §4A1.2(c) . . .." This conduct adds 1 point.

Two other incidents do not add any criminal history points. On February 2, 2021, Legros was charged in Michigan with a violation of Invalid Certificate of Motor Vehicle Insurance, M.C.L. 500.3101a. M.C.L. 500.3101a(5) reads, "A person who supplies false information to the secretary of state under this section or who issues or uses altered, fraudulent, or counterfeit certificate of insurance is guilty of a misdemeanor punishable by imprisonment for not more than 1 year . . .." A bench warrant was issued by Michigan's 67th District Court on April 14, 2021, and at a hearing held on June 21, 2021, the charge was dismissed.

On June 23, 2022, a felony warrant was issued for a violation of Assault/Resist/Obstruct Police causing injury, in violation of M.C.L. 750.81d(2), which reads, "An individual who assaults . . . a person who the individual knows . . . is performing his or her duties causing a bodily injury requiring medical attention . . . is guilty of a felony punishable by imprisonment for not more than 4 years . . .." Legros was arrested on this warrant, alongside the present case, and held on a $10,000 bond. On February 8, 2024, this charge was dismissed.

Legros struggles with substance abuse. This struggle has exasperated her mental health, which has led her to cause severe physical harm to her body. The factual underpinning of the assault on June 23, 2022, was during such a period. Legros, attempting to check herself into a

11

hospital, was confronted and kicked a hospital security officer. Currently, Legros must use a walker and can only walk short distances without assistance. Slowly, she is improving; however, the foundation of any recovery is going to be Legros's ability to remain free of unprescribed substances and use only substances that are prescribed. This Court should impose, as part of her supervised release conditions, the recommendations from the Bureau of Prisons's Licensed Clinical/Forensic Psychologist.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

In order to deter Legros's criminal behavior, this Court must maintain supervision over her to ensure the potential issues identified by the Bureau of Prisons does not repeat. Those concerns are outlined within the sealed filing described in this Court's minute order of April 24, 2024.

Further concerns arise when considering Ms. Legros's post-January 6 conduct. Legros was unable to locate the vehicle she drove to Washington D.C. In a recording on January 8, 2021, Legros acknowledged that she understood, "They're trying to find everybody who was in there." Instead of contacting police, she soon abandoned her grandmother's vehicle and fled back to Michigan on a Greyhound bus.

### E. The Need to Avoid Unwarranted Sentencing Disparities

This Court specifically asked the parties to reference heavily other January 6 sentences following this defendant's plea of guilty. As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Legros based on her own conduct

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

13

and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Legros has pleaded guilty to Count six of the indictment. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the varying recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Further, as part of the plea agreement the government has agreed to cap its allocution to the correctly scored guideline range.

14

At the time of this writing, the government can identify 67 prior sentences for a single violation of 18 U.S.C. § 1752(a)(1) in the January 6, 2021, context. In 39 of those cases, the Court has imposed some amount of incarceration. In 7 others, the Court imposed some amount of home detention without incarceration. In 13 cases, the Court has sentenced an individual for a single violation of 18 U.S.C. § 1752(a)(1) to a term of confinement—whether incarceration, home detention, or a combination of both—of approximately 3 months or more.[3]

In one such case, *United States v. Jia Liu*, 21-cr-711-TJK, Judge Timothy J. Kelly imposed a sentence of 4 months incarceration followed by one-year supervised release. In *Liu*, the defendant traveled to Washington D.C. on January 6, 2021, from Queens, New York. Unlike in the present case, the defendant in *Liu* entered the building later in the day, at approximately 3:24 p.m., and left 7 minutes after. Then, the defendant reentered the building for 27 more minutes and watched during the obvious attempts by police to get rioters to leave the building. Much like the present case, the defendant in *Liu* recorded dozens of videos while on the Capitol grounds, including numerous photos depicting officers in riot gear attempting to remove rioters from the building and grounds. Although the sentence in *Liu* was driven by other criminal conduct committed while on pretrial release, that other conduct was not assaultive in nature like it is in the present case.

In another case, *United States v. Jeffrey Grace*, 21-cr-296-RDM, Judge Randolph D. Moss imposed a sentence of 75 days incarceration followed by one-year supervised release. In *Grace*, the defendant travelled to Washington D.C. from Washington state. The defendant walked with a large group of Proud Boys to the same breach point utilized by Legros. The defendant in *Grace*

---

[3] Included within this number are two instances of '28 days' in addition to two-months home detention. In both cases, 28 days was the result of 2 instances of 14-days of intermittent confinement as a condition of probation. *See United States v. Heather Kepley*, 23-cr-162-BAH, and *United States v. Robert Schornake*, 21-cr-278-BAH.

15

entered at approximately 2:23 p.m. But unlike the present case, the defendant in *Grace* left the building at approximately 2:31 p.m., more than an hour before Legros.

Finally, in *United States v. Dennis Adams*, 23-cr-396-TSC, Judge Tanya S. Chutkan imposed a sentence of 45 days incarceration followed by one-year supervised release. In *Adams*, the defendant entered into the building twice—including once through a window—and spent a total of approximately 20 minutes inside the building. Much like the present case, the defendant in *Adams* was around violent confrontations with police and made no effort to leave the restricted area. Unlike the present case, the majority of the time the defendant was in the restricted area the defendant in *Adams* was outside the building. Also, this recent sentencing included application of § 4C1.1, which provided a 2-level decrease to the guidelines—not applicable in the present case.

Legros spent more time in the Capitol than all three defendants mentioned above. Although Legros has no association to an organized group like the defendant in *Grace*, her conduct on January 6, was far more severe. Unlike the defendants in *Liu* and *Adams*, Legros only entered the building once.[4] But during her one entry, she remained for more than an hour. Further, while inside she entered the Speaker's Suite of offices, joined in chants with other rioters and witnessed a specific push towards the Senate Chamber shortly after the Senators were evacuated.

Cases before the United States Court of Appeals for the District of Columbia Circuit decision in *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023) should also be illustrative as having more data points for this Court to consider. Importantly, a defendant's entry into a sensitive space, such as a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A

---

[4] At one-point Legros travels outside on to a balcony, only accessible from inside the Capitol. The government does not include this as 'exiting and reentering' the Capitol building.

defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Derek Jancart*, 21-cr-148-JEB, the defendant pled guilty to a single count of 40 U.S.C. § 5104(e)(2)(D) (Disorderly or Disruptive Conduct in a Capitol Building), a Class B misdemeanor. In *Jancart*, the defendant laughed and cheered while the forward line of the rioters broke through and made it all the way into the Speaker's conference room. But in *Jancart*, the defendant was inside the Capitol for 40 minutes. At sentencing, the Court imposed a 45-day sentence.

In *United States v. Robert Reeder*, 21-cr-166-TFH, the defendant was also specifically hit with tear gas but remained within the restricted perimeter. In *Reeder*, the defendant pled to one Class B misdemeanor count in violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, Picketing inside a Capitol building). Much like the present case, the defendant in *Reeder* recorded the chaos around him and joined others in chants. Further, the defendant was inside the Capitol for approximately 30 minutes but did not enter a more sensitive area than the Rotunda and the hall outside the Senate Chamber. There, the Court imposed a sentence of 3 months incarceration.

Finally, in *United States v. Jennifer Ryan*, 21-cr-050-CRC, the defendant pled guilty to one violation of 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, Picketing inside a Capitol building) and was sentenced to serve a term of 2 months incarceration. In *Ryan*, the defendant observed what was occurring on national news and then went to the Capitol. Further, the defendant entered the Capitol building at approximately 3:21 p.m., and left approximately 3 minutes later.

The defendant in *Ryan* remained just outside of the East Rotunda Door and recorded the damage and destruction, and even had a photo taken of herself in front of a broken window.

At the time of writing, the government was able to locate 405 previous sentencings for a violation of one or both Class B misdemeanors. Of those cases, the government can identify 270 cases where the Court imposed some level of confinement. Of those, 48 sentences imposed some type of confinement—whether incarceration, home detention, or a combination of both—at, or above, 3 months. But as the cases above illustrated, there is usually only one aggravating factor that would weigh in favor of incarceration. In the present case, Legros's conduct includes all those aggravators in one case. Incarceration at three months is appropriate.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Legros must pay $500 in restitution, which reflects in part the role Legros played in the riot on January 6.[6] Plea Agreement at ¶ 10. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Legros's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

**VII.  Fine**

The defendant's conviction subjects her to a statutory maximum fine of $100,000 *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that she is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant was homeless prior to her arrest, and has been either incarcerated or held within a medical setting since January 2023.

**VIII.  Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to three months of incarceration followed by one-year supervised release. Such a sentence protects the community by continuing to ensure Legros maintains her physical and mental health, promotes respect for the law by holding her accountable for her actions on January 6, 2021, and deters future crime by imposing restrictions on Legros's liberty as a consequence of her behavior, while further recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ *Adam M. Dreher*
_____
ADAM M. DREHER
Assistant United States Attorney
Michigan Bar No. P79246
601 D St. N.W.
Washington, D.C. 20530
(202) 252-1706